## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Leonard Chukwualuka Onyiah,

        Plaintiff,

v.

St. Cloud State University, Board of
Trustees Minnesota State Colleges and
Universities,

        Defendants.

**MEMORANDUM OF LAW &
ORDER**
Civil File No. 08-4948 (MJD/LIB)

---

P. Chinedu Nwaneri, Nwaneri Associates, PLLC, Counsel for Plaintiff.

Kevin A. Finnerty, Minnesota Attorney General's Office, Counsel for Defendants.

---

## I.     INTORDUCTION

This matter is before the Court on Defendants' Motion for Summary

Judgment [Docket No. 139], Defendants' Motion to Exclude Expert Testimony of

Dr. Ravindra Kalia [Docket No. 150], Defendants' Motion to Strike Declaration of

Leonard Onyiah Submitted in Opposition to Defendants' Motion for Summary

Judgment, [Docket No. 174], Plaintiff's Motion to Strike Parts of Affidavits

1

[Docket No. 188], and Plaintiff's Motion for Extension of Time to File Documents [Docket No. 203].  Oral argument was heard on February 4, 2011.

## II.    FACTUAL BACKGROUND

### A. Parties

Plaintiff Leonard Onyiah is a black man born in Nigeria in 1949.  He obtained his Ph.D. in Statistics in 1989 from the University of Strathclyde.  In 1992, Plaintiff joined the faculty at University of Northumbria and taught there until 1997.  He won an immigration lottery in 1997 and emigrated to the United States.

Defendants are Saint Cloud State University ("SCSU") and the Board of Trustees of Minnesota State Colleges and Universities ("MnSCU").  MnSCU is the largest provider of higher education in the State of Minnesota.  SCSU is one of the seven universities operated by MnSCU.  SCSU is divided into five colleges, each headed by a separate dean.  The College of Science and Engineering ("COSE") has twelve departments, including the Department of Statistics/Computer Networking ("SCN").  All MnSCU university instructional faculty are represented by the Inter –Faculty Organization ("IFO").  The IFO

negotiates collective bargaining agreements ("CBAs") with MnSCU on behalf of the instructional faculty.

### B. SCSU and the Minnesota State Colleges and Universities System

Faculty members at SCSU are appointed by the President of the University or by a designee. The hiring process starts in the Fall, when departments identify needs for the upcoming year and request that certain positions be filled. The departments then forward these requests to the dean of the college to which that department belongs. The dean then evaluates those requests, relative to whether there are vacancies in the department, and whether there is available funding, as well as other variables.

Once a department has approval to hire an individual, the department forms a search committee, which is overseen by the Office of Affirmative Action ("OAA"). The OAA then issues a notice of vacancy ("NOV"), which announces an available position. This NOV includes the rank the faculty member will be assigned, and what the qualifications for the position are, as well as other information. The search committee then begins to evaluate the potential candidates, and eventually begins to conduct interviews with a smaller subset of the candidates. After conducting these interviews, the committee makes a

recommendation to the dean of the respective college, and then the dean makes the recommendation to the President who would make the final decision as to whether or not to hire an individual.

Once a hiring decision is made, the chair of the search committee and the dean go over the candidate's degree and experience to determine what the initial rank for a faculty member will be, if the NOV stated that the rank was "open." If the NOV lists a specific rank for the position, the candidate can only be offered the advertised rank, absent approval by the Provost and the Provost's budget staff.

Once the rank is determined, the dean of the college then inputs various data, including the candidate's academic discipline, and years of experience into a "salary calculator" algorithm and obtains an appropriate salary range for the candidate. This range usually consists of four or five "steps." Prior to 2004, the initial salary range was determined in a similar manner using hard copy grids which did not factor in the candidate's academic discipline. The dean often will consult with the chair of the department, or the person who has been communicating most with the preferred candidate, before making an initial salary offer. If that candidate is still interested the dean forwards the paperwork

to the Provost, and the Human Resources department, in order to make sure the salary calculations were properly computed.  If the candidate negotiates, the dean may offer a higher salary, within the range of salaries.  In order to offer a salary beyond the indicated range, the dean must justify a need requiring a higher amount, and the Provost must approve the offer.  Once an agreement is reached, the paperwork is submitted to the Provost, Human Resources, the OAA, and the President for final approval.  Once an individual's initial salary is set, his future compensation is determined by the terms of the CBA.  However, a faculty member's salary can also be increased following a promotion or salary review process.

### C. Onyiah's Employment with SCSU

Before becoming employed with SCSU, Plaintiff was living in Maryland when he saw an advertisement for a position as a fixed-term assistant professor for the 1998-99 academic year.  David Robinson ("Robinson") was the head of the search committee for SCN in 1998.  Robinson, Bayo Lawal ("Lawal"), who was the department chair of SCN, and some other members of the committee conducted a phone interview with Plaintiff.  Sometime after this interview, Lawal offered Plaintiff the assistant professor position for which Plaintiff had

applied.  Plaintiff accepted the position immediately and accepted the specified

salary.  At the time Plaintiff accepted this job, he had accumulated 17.5 years of

collegiate level teaching experience.

Lawal is a black man who, like Plaintiff, was born in Nigeria.  Lawal left

SCSU in 2005, and currently lives and works in Nigeria.  In 1998, Lawal

recommended to the COSE dean at the time, A.I. Musah ("Musah") that the

Plaintiff be hired.  Musah, a black man born in Ghana, approved the hire.  Musah

left SCSU in 2003, he currently lives and works in the U.S. Virgin Islands.

Onyiah did not negotiate for his initial salary, in part because he did not know

that he could bargain for a higher salary.  Plaintiff's salary for the 1998-99

academic year was set at $43,732, a number above the maximum range of salaries

according to the applicable pay grids.

Almost immediately, Plaintiff complained to Lawal about his salary.

Lawal at this point helped Plaintiff to obtain a bank loan.  Plaintiff testifies that at

this time he asked for his rank to be changed, but was told by Lawal that he had

applied for, and accepted, a job as an assistant professor.  Plaintiff further

testifies that Lawal told Plaintiff to stop complaining because the "whites" in the

department didn't want him there and that these people did not like Plaintiff because he was black.

Plaintiff states that given the position he had in England, he should have been ranked as at least an associate professor.  Article 21 of the CBA states:

> **Section D. Initial Assignment to Rank.**  Qualifications for initial assignment to faculty rank are to be as follows.
>
> **Professor:**  Earned Doctorate or other appropriate degree, plus ten (10) years of collegiate-level teaching or related experience.
>
> **Associate Professor:**  Earned doctorate or other appropriate degree, plus seven (7) years of collegiate-level teaching or experience.
>
> **Assistant Professor:**  Earned doctorate or other appropriate degree.
>
> **Instructor:**  Appropriate preparation.
>
> Normally, no faculty member may be assigned to a rank more than one (1) level below that for which he/she is qualified.  In each instance, the President shall establish what constitutes appropriate experience and appropriate degrees for the purpose of assignment to rank.

(Dale Aff. Ex. 1, Art. 21)

Since the position for which the Plaintiff applied and accepted was a fixed-term position, his contract was subject to renewal by the University each year. Plaintiff's contract was renewed for the 1999-2000 academic year.  He received an above range salary of $47,380 for the 1999-2000 academic year.

During his second year as a fixed-term faculty member, SCSU advertised for a probationary assistant professor position in the SCN for the upcoming academic year.  Plaintiff applied for this position but found out that the position was offered to Byron Gajewski ("Gajewski"), a white man considerably younger than Plaintiff.  The university contends that they hired the person they deemed to be the most qualified.

Subsequent to this, Plaintiff was informed that his contract would not be renewed for the 2000-01 academic year.  Plaintiff was not able to find another academic position for that year. In January of 2001, Plaintiff wrote to Lawal applying for a probationary assistant professor position which SCSU had advertised.  Lawal was the head of the search committee with regard to this position, and Robinson was the SCN chair.  SCSU, however, was facing budget concerns and determined that it could not offer the probationary position, and Lawal informed the applicants that the probationary position was no longer available but that a fixed-term assistant professor position would be available for the 2001-02 term.  Plaintiff expressed interest in the fixed-term position.  Plaintiff was interviewed by Robinson and Lawal, and Musah approved the rehiring of Plaintiff.

Musah worked with Robinson to prepare a salary offer to the Plaintiff for the advertised assistant professor position.  Plaintiff again did not negotiate for a greater salary, and accepted the salary offered.  Shortly after Plaintiff returned to SCSU, SCN advertised a probationary position with an open rank, which was to begin in January 2002.  Plaintiff was hired to fill this position, and on January 10, 2002 he became a probationary associate professor.  At this time, Plaintiff's salary was set at $52,087, the midpoint of the applicable salary range.  Once Plaintiff's salary was set at $52,087, Plaintiff was placed on step 23 for compensation purposes.  Since Plaintiff's employment has been continuous from this point on, his salary and pay increases all stem from SCSU initially placing Plaintiff at step 23.

Plaintiff continued to complain that he was not being paid enough. Plaintiff testifies that Lawal informed Plaintiff that Musah told Lawal that he could only offer the Plaintiff $5,000 more than Plaintiff was previously making "without raising eyebrows."  Plaintiff testified that Lawal and Musah paid him a lower salary because he was a member the Igbo ethnic group in Nigeria and was a Christian, as opposed to being a member of the Yoruba ethnic group and a Muslim, like Lawal.

In 2006, Plaintiff was promoted to the rank of professor.  As part of that promotion, Plaintiff received a two-step salary increase.  Plaintiff has also received CBA-negotiated raises, and currently his salary is $71,267.  (Id. 195)

### D. Salary Review Process

MnSCU and IFO have contractually agreed to go through a comprehensive review of salaries every four or five years to see if any salary imbalances exist.  Additionally, newly hired faculty members have their salaries reviewed each year.  Plaintiff states that his initial rank assignment was never reviewed by SCSU in 1998, 2001, and 2002, the years in which Plaintiff was hired by SCSU.

The larger, system wide equity studies are led by a salary review committee made up of an equal number of members of the IFO and MnSCU management.  This committee receives a report from an independent entity regarding the salaries of the faculty members, and the committee then decides which faculty members' salaries will be adjusted.  In 2002, the committee decided to adjust the salaries of faculty members whose salaries were more than one standard deviation away from their expected salary, as found by the independent entity.  In 2006, the committee decided to adjust the salaries of

faculty members whose salaries were found to be more than two steps below

their estimated step.

In the 2002 study, Plaintiff's salary was found to be 1.23 standard

deviations below his predicted salary.  As a result of this study, Plaintiff received

a step adjustment, which raised his salary, awarded him back pay, and elevated

him a step.  In the 2006 study, it was determined that Plaintiff's salary was not

more than two steps below his predicted step, and accordingly his salary was not

adjusted.  Plaintiff testified that he disagreed with the placement of the statistics

professors with the mathematics professors for the purpose of the study.

Furthermore, Plaintiff testified that he disagreed with the fact that the study did

not include the productivity of the professor in determining whether a particular

faculty member was undercompensated.

### E.  Procedural Background

Plaintiff commenced this suit by filing a Complaint with this Court on

August 11, 2008.  [Docket No. 1]  Subsequently, Plaintiff amended his Complaint.

[Docket No. 71]  Plaintiff's Amended Complaint alleged Count I: Discrimination

in Compensation in Violation of Lilly Ledbetter Fair Pay Act of 2009, Count II:

Discrimination in Employment Based on Age in Violation of the Age

Discrimination in Employment Act ("ADEA"), Count III: Hostile Work Environment, Count IV: Breach of Duty of Fair Representation on the Part of IFO, and Count V: Intentional Infliction of Emotional Distress against the Defendants, as well as the IFO, and a number of individual defendants.

On September 17, 2009, the Court dismissed all the individual defendants, as well as the IFO, and dismissed all of Plaintiff's claims except for Plaintiff's pay discrimination claims, which the Court analyzed under Title VII and the ADEA. [Docket Nos. 79, 80]  On November 10, 2010, Defendants filed a Motion for Summary Judgment on Plaintiff's remaining claims.  [Docket No. 139].  On the same day, Defendants brought a Motion to Exclude the Expert Testimony of Dr. Ravindra Kalia.  [Docket No. 150]  On January 6, 2011, Defendants filed a Motion to Strike the Declaration of the Plaintiff.  [Docket No. 174]  On January 21, 2011, Plaintiff brought a Motion to Strike Parts of Affidavits.  [Docket No. 188]  On January 29, 2011, Plaintiff filed a Motion for Extension of Time to File Documents.  [Docket No. 203]  In particular, Plaintiff seeks an extension to file Docket Nos. 194, 198, 199, and 202 in opposition to Defendants' Motion to Strike Pleadings, and Docket Nos. 189-191 in support of Plaintiff's Motion to Strike Pleadings.

III.   DISCUSSION

 A. Defendants' Motion to Exclude Expert Testimony

Plaintiff seeks to introduce the expert testimony of Dr. Ravindra Kalia.

Plaintiff states that Dr. Kalia is an expert on salaries at SCSU.  Plaintiff wishes to

offer Dr. Kalia's opinion on the amount Plaintiff has been underpaid during his

employment with SCSU.

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by firsthand knowledge, skill,
> experience, training, or education, may testify thereto in the form of
> opinion or otherwise; if (1) the testimony is based upon sufficient
> fact or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and
> method reliably to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

U.S. 579 (1993), held that district courts act as gatekeepers with regard to the

admissibility of expert testimony.  Id. at 592-93.  Among the factors that the

Supreme Court identified for district courts to use in determining the

admissibility of expert testimony include, "whether the theory or technique is

subject to testing, whether it has been tested, whether it has been subjected to

peer review and publication, whether there is a high known or potential error rate associated with it, and whether it is generally accepted in the relevant community." Unrein v. Timesavers, Inc., 394 F.3d 1008, 1011 (8th Cir. 2005).  The above stated factors are not exhaustive however, and district courts have great flexibility to use the factors to determine the reliability of expert testimony in a particular case.  Presley v. Lakewood Eng'g & Mfg. Corp., 553 F.3d 638, 643 (8th Cir. 2009).  The burden of proving an expert's admissibility is on the proponent of the testimony.  Wagner v. Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006).

When expert testimony constitutes "unabashed speculation," unsupported by the record, the Court does not abuse its discretion by excluding it.  Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1084 (8th Cir. 1999).  See also Weisgram v. Marley Co., 169 F.3d 514, 519 (8th Cir. 1999) (holding that district court abused its discretion by permitting expert "to speculate before the jury . . . by relying on inferences that have absolutely no record support").

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

Bonner v. ISP Techs., Inc., 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting Hose v.

Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1996)).

### 1.   Dr. Kalia's Qualifications as an Expert on SCSU  Salaries

Dr. Kalia offers seven qualifications that make him an expert in SCSU

salaries, such as Plaintiff's.  These qualifications are as follows:

- I have been a faculty of SCSU for 25 years, and in State University system for 29 years;
- I have been active in Faculty Senate and Faculty Association most of these years;
- I have been a President of Faculty Association (in 1998, the year Dr. Onyiah was employed by SCSU, for two years until May 2000);
- I know the rules that should govern equity and remuneration of Faculty in SCSU;
- I am an expert on the Collective Bargaining Agreement (CBA) between MnSCU and IFO and earlier the State University System (SUS);
- I have represented quite a few faculty members in Grievances in the system;
- Being a Professor of Mathematics, I am well-placed to know about remuneration of professionals in the quantitative and IT sciences of Mathematics, Statistics, and Computer Science.

These qualifications do not show that Dr. Kalia possess the requisite

qualifications to be considered an expert on SCSU salaries.  Dr. Kalia's statement

that he is a professor of Mathematics is irrelevant with regard to offering an

opinion on how much Plaintiff initially should have been making.  Additionally,

Dr. Kalia's statement that he knows which rules should govern and that he is an

expert in the CBA are conclusory statements that do not explain why he knows

which rules should govern or why he is an expert in the CBA.  Finally, although

Dr. Kalia has been a faculty member of SCSU for a long period of time, and that

during that time he has been active in faculty associations, this does not qualify

him as an expert with regard to Plaintiff's salary, because Plaintiff never

approached Dr. Kalia concerning his salary, and Dr. Kalia has never been

involved in setting or changing a faculty member's initial salary.  Accordingly,

the Court finds that Dr. Kalia is not qualified to opine about how much Plaintiff

has been underpaid over the years, and thus his proposed testimony must be

excluded.

### 2.   Reliability of Dr. Kalia's Testimony

If the Court were to find Dr. Kalia qualified to render his proposed

opinion, the Court would still find that his testimony is subject to exclusion

because it is not relevant or reliable.  Dr. Kalia's report offers no basis for the

starting salaries and steps he assigned to the Plaintiff.  All of his subsequent

calculations concerning the salary Plaintiff should have been paid throughout his

employment are predicated on this initial step assignment.  Since the initial

assignment is unreliable, every salary determination in Dr. Kalia's report is

unreliable.  In preparing his report, Dr. Kalia did not use the salary pay grids, which SCSU used to determine Plaintiff's initial salary, despite the fact that these grids were produced to Plaintiff, and despite the fact that Dr. Kalia acknowledged that these grids are used to determine a faculty member's initial salary.  Since Dr. Kalia stated he did not use the salary pay grids in making his report, the report and proposed testimony is speculation.

In the present case, Dr. Kalia's opinion amounts to speculation, because it does not explain why, in his report, Plaintiff is set at a specific starting salary, nor does it use the salary grids used by SCSU to determine faculty member's salaries. Dr. Kalia's assignment of Plaintiff to a random starting salary is "devoid of competent, factual predicates," and thus must be excluded.  Kemp v. Tyson Seafood Grp., Inc., No. Civ. 5-96-173 JRT/RLE, 2000 WL 1062105, at *9 (D. Minn. July 19, 2000).  Accordingly, the proposed testimony must be excluded.  Since the Court will exclude Dr. Kalia's proposed testimony, the Court will not address Defendants' argument that the declaration submitted by Dr. Kalia in response to Defendants' motion to exclude Dr. Kalia's testimony went beyond supplementation.

**B.  Plaintiff's Motion for Extension of Time**

On January 29, 2011, Plaintiff filed a motion requesting a time extension to file certain documents.  The documents for which Plaintiff requests a time extension are as follows:

Documents in opposition to Defendants' Motion to Strike Pleading

- Amended Declaration of Onyiah [Docket No. 194]
- Declaration of P. Chinedu Nwaneri [Docket No. 198]
- Memorandum in Opposition [Docket No. 199]
- Placeholder for Exhibits [Docket No. 202]

Documents in Support of Plaintiff's Motion to Strike Pleadings

- Notice of Hearing on Motion [Docket No. 189]
- Declaration of P. Chinedu Nwaneri [Docket No. 190]
- Memorandum in Support of Motion [Docket No. 191]

Plaintiff's counsel states that he inadvertently believed that he had until January 28, 2011 to file his response to Defendants' motion to strike pleadings, according to Local Rule 7.1(a)(2).  (Nwaneri Decl. in Support of Motion for Extension of Time ¶¶ 2, 7.)  Plaintiff's counsel contends that he was engaged in another summary judgment motion which was heard on January 20, 2011, and that he overlooked the custom deadline of January 20, 2011 for his response.  (Id. ¶ 6.)

Moreover, Plaintiff's counsel states that on January 22, 2011, his wife became ill and needed to be brought to the emergency room.  (Id. ¶ 10.)  He

further notes that he needed to bring his wife to various appointments and because she could not drive also had to bring his children to school.  (Id. ¶¶11-12.)  Counsel asserts that these facts, coupled with preparation for his earlier motion, slowed his work and led to these late filings.  (Id. ¶ 13.)

Given the circumstances articulated by Plaintiff's counsel, the Court grants Plaintiff's motion, and has considered the documents described above.

### C. Defendants' Motion to Strike Declaration of Plaintiff

On January 6, 2011, Defendants filed a Motion to Strike the Declaration of Leonard Onyiah submitted in opposition to Defendants' Motion for Summary Judgment.  [Docket No. 176]  Defendants argue that this declaration is, in fact, a second brief in opposition, filed in violation of Local Rule 7.1(d).  Defendants assert that Plaintiff already filed an 11,965 word opposition to Defendants' motion for summary judgment.  [Docket No. 170]

At the summary judgment stage, a court considers "only admissible evidence and disregard[s] portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions of fact."  Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 801 (8th Cir. 2004); see also Fed. R. Civ. P. 56(c).  Defendants argue that this

declaration does nothing more than argue point by point against the Defendants'

memorandum in support of summary judgment.  Accordingly, Defendants claim

that this declaration is argument, as opposed to statements of personal

knowledge made by the Plaintiff.

Plaintiff, on January 27, 2011, filed an amended declaration of the Plaintiff

in opposition to the Defendants' motion for summary judgment and motion to

strike.  [Docket No. 194]  Accordingly, Defendants' motion to strike the original

declaration is moot because Plaintiff has filed an amended declaration.  Thus, the

Court will deny Defendants' motion

### D. Plaintiff's Motion to Strike Portions of Affidavits

On January 21, 2011, Plaintiff filed a motion to strike paragraphs 9 and 11-

13 of the Affidavit of Amos Olangunju [Docket No. 147], paragraphs 7 and 9 of

the Affidavit of David Robinson [Docket No. 148], paragraphs 3-11 of the

Affidavit of David DeGroote [Docket No. 145], and paragraphs 5-22 of the

Affidavit of Chris Dale [Docket No. 144].

The Court will deny Plaintiff's motion.  The paragraphs from the various

affidavits that Plaintiff wishes to strike comply with Rule 56.  The Court finds

that these paragraphs are based upon the personal knowledge of the affiants.

With particular attention to Dale's affidavit, Dale is an individual who is intimately familiar with SCSU's process for setting initial salaries. His affidavit factually explains how Plaintiff's salary would be set according to SCSU's salary grids. Thus, because the affidavits comply with Rule 56, the Court will deny Plaintiff's motion.

### E. Defendants' Motion for Summary Judgment

#### 1.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Factual disputes that are irrelevant or unnecessary will not be counted. (Id.)  "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## 2.   Salary Discrimination Claim in Violation of Title VII

Title VII prohibits an employer from discriminating against individuals regarding their compensation based upon an "individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  In discrimination cases under Title VII a plaintiff may survive a motion for summary judgment by either presenting "evidence showing a specific link between the alleged discriminatory animus and the challenged decision" or "by creating an inference of unlawful discrimination under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)."  Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 863-64 (8th Cir. 2008).

Where there is no direct evidence of salary discrimination courts apply the McDonnell Douglas burden shifting analysis.  Ottoman v. City of Independence, Mo., 341 F.3d 751, 758 (8th Cir. 2003) (applying the McDonnell Douglas

framework to evaluate an alleged claim of gender-based wage discrimination in violation of plaintiff's right to equal protection).  Although the Eighth Circuit has not explicitly applied the <u>McDonnell Douglas</u> burden shifting analysis to a case of salary discrimination under Title VII other courts have applied this framework to such cases.  <u>See</u> <u>Adams v. CBS Broadcasting, Inc.</u>, 61 Fed. App'x 285, 288 (7th Cir. 2003); <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1362-63 (10th Cir. 1997); <u>Meeks v. Computer Assocs. Int'l</u>, 15 F.3d 1013, 1018-19 (11th Cir. 1994).  Accordingly, the Court will analyze Plaintiff's Title VII claims under this framework.

### a. **McDonnell Douglas** Analysis

Under the <u>McDonnell Douglas</u> framework, Plaintiff must first establish a prima facie case of discrimination.  In order to establish a prima facie case, Plaintiff must show that SCSU paid employees of different races or national origin different salaries "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  <u>Tademe v. Saint Cloud State Univ.</u>, 328 F.3d 982, 989 (8th Cir. 2003) (citation omitted).  The test to determine if another employee is similarly situated "requires that the other employees be similarly situated in all

relevant aspects before the plaintiff can introduce evidence comparing [himself] to the other employees." <u>Fields</u>, 520 F.3d at 864 (citation omitted).  Where a decision is made by a different decision maker, "two decisions are rarely similarly situated in all relevant respects." <u>Id.</u> (citation omitted).

If Plaintiff can establish a prima facie case, then the burden shifts to SCSU to offer a legitimate, non-discriminatory reason for its actions.  <u>Sowell v. Alumina Ceramics, Inc.</u>, 251 F.3d 678, 683 (8th Cir. 2001).  "Once the defendant advances such a justification, the plaintiff must show that the defendant, regardless of the proffered reasons, intentionally discriminated against [him]." <u>Ottoman</u>, 341 F.3d at 758 (citation omitted).  "The plaintiff must show that a discriminatory reason more likely than not motivated the employer to pay [him] less." <u>Id.</u> (citation omitted)

Plaintiff cannot establish a prima facie case of salary discrimination based on race or national origin. Plaintiff his opposition and amended declaration does not direct the Court to any employees outside of his protected classes who were paid higher salaries for equal work.  Instead, Plaintiff makes general statements which simply state that white professors were paid more than him, without specifically directing the Court to certain professors.

Additionally, Plaintiff's argument that he was discriminated against based on his race and national origin is undercut by the fact that two professors who, like Plaintiff, were black and hailed from Nigeria received high starting salaries. In the Spring of 2002, SCSU hired Dr. Amos Olangunju ("Olangunju") and Dr. Alfred Akinsete ("Akinsete") and paid them both above range salaries of $79,774 and $66,006, respectively. Both Olangunju and Akinsete, like Plaintiff, are black men from Nigeria. Akinsete was given a higher salary because of the increased demand for statisticians at the time of Akinsete's hiring, thus providing a market justification for Akinsete's higher salary. Olangunju was given a higher salary because he was in a position to bargain for a higher salary because at the time he was hired he was already employed at another institution. Since Plaintiff does not specifically identify any professors outside of his protected classes who received higher salaries for the same work, and because there were other professors hired by the same decision maker who are of the same race and national origin who were paid higher salaries, Plaintiff cannot establish a prima facie case for discrimination based on race or national origin.

Defendant directs the Court to <u>McIntyre v. Longwood Cent. Sch. Dist.</u>, 380 Fed. App'x 44 (2d Cir. 2010), where a plaintiff alleged race, age, and sex

discrimination when he only received a 17% raise under a collective bargaining

agreement, when others received raises from 27%-37%.  Id. at 47.  The court

found that the plaintiff had not established a prima facie case, in part, because

"[m]ost saliently, not only did other members of the protected groups to which

McIntyre belongs not suffer similarly unfavorable treatment, in many cases they

received especially high salary increases."  Id. at 49.   In the case at hand, the facts

are similar, in that members of the same protected groups that Plaintiff belongs

to were hired into the same department by the same decision maker and received

high salaries.

Plaintiff now contends that he was discriminated against by Lawal because

Lawal was a member of the Yoruba tribe, and Plaintiff was a member of the Igbo

tribe.  Further, Plaintiff alleges that Akinsete and Olangunju were given higher

salaries than Plaintiff is because they are also members of the Yoruba tribe.

Additionally, Plaintiff argues that he was discriminated against by Lawal

because Lawal is a Muslim and Plaintiff is a Christian.

Although Plaintiff now argues that he has been discriminated against

based on his religion and tribal affiliation, this Court previously denied

Plaintiff's motion to amend his Amended Complaint to include such allegations.

[Docket No. 129.]  Plaintiff however directs the Court to <u>Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.</u>, 154 F.3d 1117 (9th Cir. 1998), to show that discrimination based on tribal affiliation is actionable under Title VII's prohibition of discrimination based on national origin.  In <u>Dawavendewa</u>, the plaintiff, a Native American who belonged to the Hopi tribe, brought suit under Title VII, alleging that he was not considered for employment because he was not a member of the Navajo tribe.  <u>Id.</u> at 1118.  The Ninth Circuit held that for the purposes of Title VII, the tribal affiliation of a Native American individual falls within the definition of "national origin."  <u>Id.</u> at 1120.   In making this ruling, the court noted that the various Native American tribes were at one time considered nations.  <u>Id.</u>  The court further noted that even if the various tribes had never been formal nations, the regulations "make clear that discrimination based on one's ancestor's 'place of origin' is sufficient to state a cause of action."  <u>Id.</u> Accordingly, Plaintiff in the case at hand argues that the discrimination he faced, as an Igbo, at the hands of Lawal, a Yoruba, is actionable under the umbrella of national origin.

The Court need not make a determination of whether or not Plaintiff's alleged discrimination because of his tribal affiliation is within the scope of

national origin discrimination under Title VII, because as mentioned above,

Plaintiff's Amended Complaint contains no allegations that he was discriminated

against due to his tribal affiliation.  Rather, in his Amended Complaint Plaintiff

simply asserts that the fact that Akinsete and Olangunju, who Plaintiff identifies

as fellow Nigerian without mention of their tribal affiliation, were paid more

than Plaintiff shows that disparate treatment is evident.  (Am. Compl. ¶ 34.)  It

was not until Plaintiff made a motion to amend the Amended Complaint that

Plaintiff made any allegations concerning discrimination based on tribal

affiliation.  (Docket No. 108 Ex. 1. At ¶¶ 22-27.)  As stated above, this Court

denied Plaintiff's attempts to amend his Amended Complaint to include

allegations that Plaintiff was discriminated against because of his religion or

tribal affiliation because Plaintiff failed to comply with the deadline for such

amendments.  (Docket No. 129 at 14.)  The Court stated, "[a]t some point – and

that point is now – pleadings should remain unaltered in order that a case can

proceed to the remainder of pretrial processing, and Trial, or a  settlement."  (Id.)

Thus, by this Court's order, allegations concerning Plaintiff's tribal affiliation are

not a part of this case.

Additionally, the Court notes that in Plaintiff's EEOC Complaint, he raised no allegations concerning his tribal affiliation.  Plaintiff in his EEOC Complaint stated "I believe I have been discriminated against on the basis of my race/ Black and national origin/ Nigerian in violation of Title VII of the Civil Rights Act of 1964, as amended."  (Docket No. 5 Ex. 56.)  "A Title VII plaintiff must file a charge of discrimination with the EEOC before bringing a civil suit, but the scope of the subsequent action is not necessarily limited to the specific allegation in the charge."  Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875, 886 (8th Cir. 1998). Accordingly, a "plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge."  Id. at 887 (citations omitted).  "Allegations outside of the scope of the EEOC charge, however, circumscribe the EEOC's investigatory and conciliatory role, and for that reasons are not allowed."  Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir. 2000).

Although Plaintiff's EEOC Complaint makes allegations of discrimination based on national origin, those allegations are based solely on the Plaintiff being a person of Nigerian origin.  Plaintiff's current allegation concerning discrimination based on tribal affiliation, under the ambit of national origin, is in

fact a separate and new theory of discrimination which does not grow out of the allegations made in the EEOC Complaint. Since Plaintiff failed to make any allegations concerning his tribal affiliation with the EEOC, Plaintiff failed to exhaust his administrative remedies. "It is generally recognized that exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." Duncan v. Delta Consol. Indus., 371 F.3d 1020, 1024 (8th Cir. 2004) (citation and quotation omitted). Accordingly, the issue of Plaintiff's tribal affiliation is outside of the scope of the administrative charge, and cannot be litigated in this action, and Plaintiff's claims of national origin discrimination are limited to his being of Nigerian origin. Since, Plaintiff cannot establish a prima facie case for salary discrimination based on national origin or race Plaintiff's salary discrimination claims under Title VII must be dismissed.

### 3.   Salary Discrimination in Violation of the ADEA

The ADEA states that it is unlawful for employers to "discriminate against any individual with respect to his compensation, term, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To

succeed on his ADEA claim, Plaintiff must provide the Court with evidence that age was the "'but-for' cause of the challenged employer decision." <u>Gross v. FBL Fin. Servs.</u>, 129 S.Ct. 2343, 2351 (2009).  In order to show discrimination by comparing himself to other employees, Plaintiff must "show that the other employees were younger than [him] and were similarly situated in all relevant respects." <u>Betz v. Chertoff</u>, 578 F.3d 929, 934 (8th Cir. 2009).  To be similarly situated, employees must typically deal with the same supervisor, or the decision-maker must be the same.  <u>Id.</u>

Neither the Supreme Court nor the Eighth Circuit has decided on whether the use of the <u>McDonnell Douglas</u> burden shifting analysis is appropriate with regard to ADEA claims after the Supreme Court's ruling in <u>Gross</u>, however courts have continued to use it.  <u>Wittsruck v. Cloverleaf Cold Storage Co.</u>, 09-90 (DWF/RLE), 2010 WL 502787, at *2, n.4 (D. Minn. Feb. 8, 2010).  Accordingly, since there is no direct evidence of age discrimination, the Court will apply the <u>McDonnell Douglas</u> framework.

Under this analysis, Plaintiff must first establish a prima facie case of age discrimination.  In order to establish a prima facie case for age based wage discrimination, Plaintiff must show that SCSU paid him a lower wage than a

younger faculty member "who was performing equal work on a job which

required equal skill, effort, and responsibility, and which was performed under

similar working condition."  Lyoch v. Anheuser-Busch Cos., Inc., 139 F.3d 612,

616 (8th Cir. 1998) (citation omitted).  If Plaintiff can show a prima facie case,

then the burden shifts to Defendants "to establish a legitimate,

nondiscriminatory reason for taking the allegedly discriminatory action."

Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010) (citation

omitted).  If Defendants articulate a nondiscriminatory reason for the alleged

discriminatory action, then Plaintiff must prove that Defendants' articulated

reason is actually pretext for discrimination.  Id. (citation omitted).  The burden

of persuasion at all times remains with Plaintiff.  Hutson v. McDonnell Douglas

Corp., 63 F.3d 771, 777 (8th Cir. 1995).

As a matter of law, Plaintiff cannot establish a prima facie case of age

discrimination.  The Court finds that the employees to which Plaintiff compares

himself are not similarly situated in all relevant respects.  The employees Plaintiff

identifies as comparators are Dr. Michael Ernst, Dr. Tirthankar Ghosh, and Dr.

Ezzat Kirmani.  These individuals were all hired by other decision makers, years

after Plaintiff was hired, and their starting salaries were computed according to

the salary calculator algorithm as opposed to the paper grids used with regard to

Plaintiff.  Once again the best comparators are Akinsete and Olangunju, who

were hired at roughly the same time as Plaintiff, by the same decision maker.

Akinsete and Olangunju are only six and seven years younger than Plaintiff, and

thus the fact that these two individuals received high starting salaries precludes

Plaintiff from establishing a prima facie case for age discrimination.  See Girten v.

McRentals, Inc., 337 F.3d 979, 981 (8th Cir. 2003) (reasoning that a nine year age

gap "may not be significant to demonstrate age discrimination"); Loeb v. Best

Buy Co., Inc., No. 05-720 (MJD/AJB), 2007 WL 2264729,  at *9 (D. Minn. Aug. 6,

2007) (finding that the fact that plaintiff was replaced by individuals seven and

eight years younger was "insufficient to establish a prima facie case of age

discrimination").

Even if Plaintiff were able to establish a prima facie case, summary

judgment would be appropriate.  Defendants have presented a legitimate non-

discriminatory reason for paying Akinsete and Olangunju more than Plaintiff.

SCSU justified Akinsete's higher salary because of the demand for statisticians

when Akinsete was hired, and Olangunju was paid a higher initial salary in

order to hire him away from another university.  Once an employee has

presented a nondiscriminatory reason for its actions a plaintiff can survive

summary judgment "only if the evidence considered in its entirety (1) create[s] a

fact issue as to whether [SCSU's] proffered reasons are pretextual and (2)

create[s] a reasonable inference that age was a determinative factor in the

adverse employment decision."  Lewis v. St. Cloud State. Univ.,  467 F.3d 1133,

1137 (8th Cir. 2006).  Plaintiff has presented no evidence which shows that the

reason Plaintiff's starting salary was lower than Akinsete's or Olangunju's was in

fact pretext for age discrimination.  Plaintiff's salary is a product of where he

initially entered the system, his subsequent promotion, and salary increases

made in accordance with the CBA.  Accordingly, Plaintiff's ADEA claim is

dismissed.

## IV.    CONCLUSION

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Defendants' Motion to Exclude Expert Testimony of Dr. Ravindra
       Kalia [Docket No. 150] is **GRANTED**.

2.    Plaintiff's Motion for Extension of Time [Docket No. 203] is
       **GRANTED**.

3.    Defendants' Motion to Strike Declaration of Leonard Onyiah
       Submitted in Opposition to Defendants' Motion for Summary
       Judgment [Docket 174] is **DENIED** as moot.

4.      Plaintiff's Motion to Strike Parts of Affidavits [Docket No. 188] is
        **DENIED**.

5.      Defendants' Motion for Summary Judgment [Docket No. 139] is
        **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  May 16, 2011                            s/ Michael J. Davis
                                               Michael J. Davis
                                               Chief Judge
                                               United States District Court